IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs May 7, 2019

**STATE OF TENNESSEE v. DAMARCUS C. NELSON**

**Appeal from the Circuit Court for Dyer County**
**No. 16-CR-358    Lee Moore, Judge**

_____

**No. W2018-00951-CCA-R3-CD**
_____

The Defendant, Damarcus C. Nelson,[1] appeals as of right from the Dyer County Circuit Court's revocation of his probation and reinstatement of the remainder of his four-year sentence for solicitation of aggravated assault. On appeal, the Defendant asserts that the trial court abused its discretion because the State failed to establish by a preponderance of the evidence that he violated the law or participated in gang-related activity, and he maintains that the remaining "technical" violations did not warrant incarceration. Following our review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which THOMAS T. WOODALL and JAMES CURWOOD WITT, JR., JJ., joined.

Matthew A. Beaird, Dyersburg, Tennessee, for the appellant, Damarcus C. Nelson.

Herbert H. Slatery III, Attorney General and Reporter; Zachary T. Hinkle, Assistant Attorney General; Danny H. Goodman, Jr., District Attorney General; and Karen W. Burns, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**
FACTUAL BACKGROUND

The Defendant was initially indicted for attempted first degree murder. See Tenn. Code Ann. § 39-13-202. On May 30, 2017, he pled guilty to solicitation of aggravated assault as a Range II, multiple offender and received a four-year sentence to be served on supervised probation. See Tenn. Code Ann §§ 39-12-102, -13-102. This sentence was to

_____

[1] The Defendant's name is spelled alternatively in the record as "Demarcus Nelson." We will use the name as spelled in the indictment.

be served consecutively "to all other offenses." It was also noted that the Defendant had "two priors" of facilitation of second degree murder which occurred on the same day.

Thereafter, the Defendant's probation officer filed a probation violation report against the Defendant on January 30, 2018. It was alleged therein that the Defendant violated Rule 1 of his probation by failing "to obey the law" due to his January 4, 2018 arrest for possession of marijuana with the intent to sell and for tampering with evidence. The trial court issued a warrant that same day.

The Defendant's probation officer filed an updated violation report on May 10, 2018. This time it was alleged that the Defendant had violated the conditions of his probation by not providing "proof of employment, seeking employment[,] or disability" for the months of January to April 2018 violating Rule 4; by not reporting to his probation officer during February or March of 2018 violating Rule 6; by not paying his arrearages of fines, court costs, or supervision fees totaling $862 violating Rule 9; and by being an active member of a gang known as the Kitchen Crips violating Rule 14.

At the subsequent revocation hearing, the Defendant's probation officer, Tamiko Manns,[2] testified and discussed the Defendant's violations. She reviewed the two violation reports and the details presented therein. Officer Manns noted that at the beginning of the Defendant's supervision on March 30, 2017, she reviewed the conditions of the Defendant's probation with him and said that he signed a copy of those rules. His probation order was entered as an exhibit.

Officer Manns stated in the history of supervision section on the Defendant's first violation report that the Defendant had previously tested positive for marijuana on July 13, 2017, and that he was referred for an alcohol and drug assessment. According to Officer Manns, the Defendant reported for that assessment, and it was determined at that time that he did not have a drug problem.

Officer Manns stated that the Defendant had not provided any proof of a "legitimate source of income" since his probation commenced on May 30, 2017. Officer Manns further testified that she had not excused any of the Defendant's missed meetings. She noted that the Defendant had provided proof that he was seeking employment and had paid some of his fines and court costs in the past. Officer Manns agreed that she would normally impose sanctions short of jail time for the Defendant's "technical" violations, which violations did not start until after the Defendant's January 4, 2018 arrest.

---

[2] The probation officer's first name is spelled "Tameka" in the transcript from the revocation hearing. However, we will use the spelling from the violation report that she prepared.

Dyersburg Police Department Officers Mason McDowell and Sterling Wright testified regarding the Defendant's drug and gang-related activity while on probation. Officer McDowell was qualified as an expert in dealing with "street crime and the drugs and gang . . . information[.]"

These officers testified that, on August 16, 2017, they were cruising in Officer Wright's unmarked police vehicle in the area of the Defendant's residence at 1641 Countryman Street. Based upon their prior interactions with the Defendant, they both believed that the Defendant resided at this address with his girlfriend, Contrera Crittenden. The Defendant and Ms. Crittenden had been together for a long time, had several children together, and had lived together at each residence "until just most recently." Officer McDowell stated that he would not "doubt" that Ms. Crittenden kept "everything in her name."

As the officers were passing the Defendant's residence, they observed a man, later identified as Broderick Lowe, holding something in his hand, "jump[] off the porch and r[u]n across the street in front of [their] vehicle." Mr. Lowe approached a car sitting in a church parking lot and engaged in what appeared to be a hand-to-hand transaction with one of the vehicle's four occupants. Based upon their experience, the officers believed that a drug transaction had occurred, so they stopped to investigate. According to Officer McDowell, when they spoke with Mr. Lowe, Mr. Lowe was attempting to conceal a plastic bag containing what appeared to be marijuana.

Being aware of the Defendant's probation status, Officer McDowell approached the residence and knocked on the front door. A female responded, "Who is it?" When Officer McDowell replied "the police department," he heard the deadbolt lock and "scrambling, moving, moving away from the door." The Defendant opened the door after "couple of minutes" had passed, and Officer McDowell immediately smelled the odor of marijuana. Officer McDowell believed the marijuana was "raw" or "not burned." Officer Wright described the smell as "very strong" and classified it as "lab marijuana." When Officer McDowell asked the Defendant about the smell, the Defendant replied "something to the effect of yeah, they just smoked a blunt."

Officer McDowell stated that he explained to the Defendant that he was on probation, that his probation order allowed them to search, and that refusal to allow them to search was a violation of his conditions. However, according to Officer McDowell, the Defendant "vehemently refused" their request to search the residence, although he "never physically refused" or hindered the officers from searching. Based upon the Defendant's actions, Officer McDowell believed "that there was in fact contraband in the house."

As Officer McDowell was waiting at the front door with the Defendant for other officers to arrive to assist with the search, Officer McDowell heard the toilet inside the residence being flushed, and he believed that "evidence was being destroyed." Officer McDowell saw Ms. Crittenden emerge from the bathroom. After Ms. Crittenden confirmed that she had flushed the toilet, Officer McDowell "ordered her" to come "back towards the living room." Shortly thereafter, Officer McDowell went into the bathroom and "observed marijuana . . . still in the bowl and . . . the tank was still filling back up at that time." Officer McDowell found more marijuana hidden in "the trap" of the toilet. Officer McDowell testified that he found approximately three grams of marijuana inside the toilet and that the marijuana was "higher grade marijuana."

Upon further search of the residence, Officer McDowell discovered digital scales in the kitchen on the counter in plain view. According to Officer McDowell, the scales "had green leafy residue" on them. The scales were also "tiny," which also indicated to Officer McDowell that they were "used to weigh[] narcotics for sale." Officer McDowell also located a Kansas City Royals baseball cap in the Defendant's kitchen "on a separate countertop but near the digital scales."

Officer McDowell stated that the Defendant was searched and that $1,500 cash was found on his person. According to Officer McDowell, he had known the Defendant since the Defendant was a juvenile; he had spoken with the Defendant on numerous occasions; and he "couldn't say that [the Defendant] ha[d e]ver held a legitimate job." Two cars were found in the driveway—one known to be driven by the Defendant, and the other by Ms. Crittenden. Officer McDowell said that he would not be "shocked" to know that both cars were owned by Ms. Crittenden, explaining that this was likely done to avoid seizure of the Defendant's vehicle due to drug-related activities. Photographs of these two cars were entered into evidence.

Furthermore, Officer McDowell testified that Ms. Crittenden gave a statement to police. Ms. Crittenden "admitted that she did . . . flush marijuana that was . . . in excess of one-half ounce" and "that all of the marijuana in the residence was hers." She claimed that the Defendant did not smoke marijuana. Ms. Crittenden also informed him that Mr. Lowe had visited the home, although she did not say when he arrived or why. Officer McDowell confirmed that Ms. Crittenden was also charged for marijuana possession and tampering with evidence.

Officer McDowell testified that based upon information he had gathered "over the years," he believed that the Defendant was likely a member a gang known as the "Kitchen Crips" and "87 Street." Officer McDowell stated that he received his "information from a number of sources," which included confidential informants, social media sites, and "surveillance on the streets." Additionally, Officer McDowell noted that he and his colleagues obtained information through "probation and parole searches,"

-4-

searches of residences and cell phones, and information from the Tennessee Department of Corrections ("TDOC").

Officer McDowell testified that the Kansas City Royals baseball cap found in the Defendant's kitchen, which had the letters "KC" on it, was gang insignia used by the Kitchen Crips. A picture of this baseball cap was entered into evidence as Exhibit 4. Additionally, according to Officer McDowell, gang insignia for the Kitchen Crips included use of the color blue and use of hand signs for the letters K and C, as well as the number 87. Officer McDowell had also seen the Defendant frequenting a bar known for gang activity. Officer McDowell found further demonstration of the Defendant's gang affiliation on social media sites, and he took "screenshots" of this activity.

Officer McDowell then stated that he had taken a total of five screenshots from the Defendant's Facebook account, which the State sought to have him review for the trial court. The Defendant objected to the introduction of the screenshots, arguing that they were not relevant because they did not have dates on them and therefore might have been taken before the Defendant began his probation on May 30, 2017.

Officer McDowell then testified concerning his knowledge of each photograph. Exhibit 6 was a photograph of four men that was taken in the kitchen of the Defendant's residence at 1641 Countryman Street. The picture was captioned, "It can be 4 of us and we move like we got 87 n---as behind us." Officer McDowell was familiar with the four men in the picture and was confident that at least three of the men, including the Defendant, were Kitchen Crips members. Officer McDowell pointed out that one of the men was wearing a baseball cap with the letters "KC" and that another man was wearing a blue bandanna. The picture was undated.

Exhibit 7 reflected that two Facebook users wished the Defendant "Happy Crip Day" or "happy C day" on November 30, 2017. The Defendant was "tagged" in this post, and it was on his Facebook "page." Moreover, the Defendant liked one of the posts. Officer McDowell testified that this was how members of the gang wished each other happy birthday, explaining that it would be disrespectful to "a Crip" to be wished a "Happy B Day," which was associated with another gang known as the "Bloods." According to Officer McDowell, the Defendant could have hidden, removed, or deleted the post from his page.

Exhibit 8 was a "club photo" of four men, including the Defendant. Officer McDowell opined that all four men were members of the Kitchen Crips. The picture was captioned, "Everywhere we go they know we run the city K Gang or don't Bang." Officer McDowell also opined that the hand signs being used by the men were insignia of the Kitchen Crips. Exhibit 8 did not reflect a date.

Exhibit 9 depicted a photograph posted to the Defendant's Facebook page by another user on January 3, 2018. The Defendant was pictured with someone wearing a Kansas City Royals jersey and both men were making gang signs with their hands. The caption above the photograph read, "Screaming free my n---a til I see my n---a that way." According to Officer McDowell, the user who posted this wanted the Defendant freed from jail because the Defendant had just been arrested on the marijuana possession charge. In addition, Officer McDowell believed that this post was made by "[a]nother Kitchen Crip."

Regarding Exhibit 10, the Defendant posted a photograph on Facebook on February 14, 2018, picturing himself wearing a blue Washington Bullets shirt. The word "Kcoolin" was written above the photo. According to Officer McDowell, the color blue and "Kcoolin" signified membership in the Kitchen Crips gang. Officer McDowell explained that the Defendant was referring to the Kitchen Crips, and had the Defendant not been a member himself, he would have faced retaliation for using their symbols.

Officer McDowell also testified about Exhibit 11, which was a photograph seized during the search of another gang member's residence. The photograph was of five men and included the Defendant. Officer McDowell confirmed that the picture was seized prior to the Defendant's going on probation. According to Officer McDowell, this image was consistent with the Defendant's being involved in gang activity.

Regarding Exhibits 6 and 8, the trial court stated that there was insufficient evidence of when these photos were taken but noted that these photos showed the Defendant was involved in gang-related activity. These pictures were marked for identification purposes only. The trial court admitted the posts that had dates on them into evidence—Exhibits 7, 9, and 10. It also admitted Exhibit 11 for the limited purpose of establishing the Defendant's awareness of gang activity.

Following the proof, the trial court found that the Defendant had violated the conditions of his probation and ordered the Defendant to serve the balance of his four-year sentence in confinement. The trial court first addressed the Defendant's alleged violation of Rule 1 by failing to obey the law, noting that the Defendant had not yet been convicted of any crime. The trial court found that the officers initially "saw something that led them to believe that there was a drug transaction going on from [the Defendant's] house and out across the street." When the officers knocked on the Defendant's door, there was "a short delay" before the door was opened, and then both officers smelled "the strong odor of . . . marijuana[.]" Ultimately, they found marijuana in the Defendant's residence, along with "a digital scale that [was] used for weighing contraband for sale." The trial court observed that the Defendant had no job history, that the Defendant had $1,500 cash on his person, and that he had already failed a drug test while on probation. The trial court also noted that the Defendant told Officer McDowell that "they [had] just

smoked a blunt," recognizing that the Defendant may have been referencing his own or someone else's smoking in the house. The trial court determined that the Defendant's having marijuana in the home was a violation on its own. The trial court further noted that evidence was being destroyed in the home, although Ms. Crittenden admitted that she was the one flushing the marijuana down the toilet.

Next, the trial court examined the Defendant's alleged violation of Rule 14 by participating in gang-related activities. The trial court relayed Officer McDowell's testimony identifying the Defendant as being part of the Kitchen Crips gang and concluded that there was "ample evidence" supporting this conclusion. Also, in making this determination the trial court referenced each of the photographs presented by the State to Officer McDowell at the revocation hearing:

> Exhibit 4 is a picture of the Kansas City Royals cap with the KC for, in this situation, according to the testimony of the officer, for Kitchen Crips involved. . . . These other things, the Exhibit 6 is a picture of—Again, that in and of itself does not necessarily create a violation but, it certainly shows that you're part of a gang and involved in gang activity. That's the same thing as with Exhibit 7. These are not things that you have posted but they've been posted on your Facebook and it's certainly indicative of, of gang involvement. The same thing with Exhibit 8, you know, I don't have any idea when these pictures were made. Those pictures in and of itself don't indicate you've violated your probation if these pictures were taken before May 30 of 2017, but it shows very clearly that you're involved in the Kitchen Crips. The same thing with Exhibit 9 and Exhibit 10 which is the picture of the Washington Bullets and the Washington Bullets in and of itself isn't significant, but the fact that it's a royal blue the color for your gang, it is significant and it is relevant to that issue. Same is true with Exhibit 11 and again the background for this is a royal blue color.

The trial court concluded, "What concerns me more than anything, is the fact that you indicate[d] that you will not participate in criminal street gang-related activities and you are obviously doing that and we can't have that."

The trial court then discussed the Defendant's alleged "technical" violations. Regarding the Defendant's failure to pay fines, court costs, or supervision fees, the trial court concluded that the Defendant had violated this condition of his probation but observed that it had never revoked someone based on this condition alone. However, the trial court continued that it would be "a little difficult . . . not to violate [the Defendant] in this situation because [he had] not paid . . . when [he] had $1,500 in [his] pocket, which ma[de] that appear to be a willful violation." The trial court also found that the Defendant was "[o]bviously" not "work[ing] at a lawful occupation to support his

dependents" but was instead "supporting them with drug money." The trial court averred, "There's not enough evidence for me to find that you are in violation . . . because of that, but there is strong evidence that with no job and $1,500 in cash in your pocket that there is drug activity going on which is a violation of your probation." Finally, the trial court expressed that the Defendant's failure to report in February and March of 2018 after he was arrested was "a very important violation."

After the trial court found the Defendant in violation of his probation, the State moved to dismiss the underlying charges of possession of marijuana with the intent to sell and tampering with evidence. The Defendant filed a timely notice of appeal. The case is now before us for review.

ANALYSIS

The Defendant contends that the trial court abused its discretion by revoking his probation because the State failed to establish by a preponderance of the evidence that he violated the law or participated in gang-related activity, and he maintains that the remaining "technical" violations did not warrant incarceration. The State responds that the trial court properly exercised its discretion in revoking the Defendant's probation and ordering him to serve the remainder of his four-year sentence in confinement.

A trial court may revoke a sentence of probation upon finding by a preponderance of the evidence that the defendant has violated the conditions of his release. Tenn. Code Ann. § 40-35-311(e). If the trial court revokes the probation, it has the right to "extend the defendant's period of probation supervision for any period not in excess of two (2) years," "commence the execution of the judgment as originally entered," or "[r]esentence the defendant for the remainder of the unexpired term to any community-based alternative to incarceration." Tenn. Code Ann. §§ 40-35-308(c), -35-311(e). In a probation revocation hearing, the credibility of the witnesses is determined by the trial court. State v. Mitchell, 810 S.W.2d 733, 735 (Tenn. Crim. App. 1991).

Furthermore, the decision to revoke probation is in the sound discretion of the trial judge. State v. Kendrick, 178 S.W.3d 734, 738 (Tenn. Crim. App. 2005); Mitchell, 810 S.W.2d at 735. The judgment of the trial court to revoke probation will be upheld on appeal unless there has been an abuse of discretion. State v. Harkins, 811 S.W.2d 79, 82 (Tenn. 1991). To find an abuse of discretion in a probation revocation case, "it must be established that the record contains no substantial evidence to support the conclusion of the trial judge that a violation of the conditions of probation has occurred." Id. (citing State v. Grear, 568 S.W.2d 285, 286 (Tenn. 1978); State v. Delp, 614 S.W.2d 395, 398 (Tenn. Crim. App. 1980)); see also State v. Farrar, 355 S.W.3d 582, 586 (Tenn. Crim. App. 2011). Such a finding "'reflects that the trial court's logic and reasoning was improper when viewed in light of the factual circumstances and relevant legal principles

-8-

involved in a particular case.'" State v. Shaffer, 45 S.W.3d 553, 555 (Tenn. 2001) (quoting State v. Moore, 6 S.W.3d 235, 242 (Tenn. 1999)).

The Defendant argues that the State failed to prove by a preponderance of the evidence that he violated his probation by possessing marijuana with the intent to sell or by tampering with evidence for flushing marijuana down the toilet. Specifically, the Defendant notes that "[t]he only marijuana on the property was found in the toilet where [the] Defendant's girlfriend was located and she later admitted that the marijuana was hers and that she had tried to flush it"; that the State moved to dismiss the charges against the Defendant after his probation was revoked; that "there are many legitimate, legal reasons" for someone to have $1,500 cash on their person; and that he was not charged with conspiracy or facilitation.

It is generally recognized that in order to prevail in a revocation proceeding based upon allegations of criminal misconduct, the State must show by a preponderance of the evidence that the defendant violated the law. See State v. Catherin Vaughn, No. M2009-01166-CCA-R3-CD, 2010 WL 2432008, at *3 (Tenn. Crim. App. June 14, 2010) (citing State v. Michael Harlan Byrd, No. 01C01-9609-CC-00411, 1998 WL 216859, at *7 (Tenn. Crim. App. May 1, 1998)). Proof of a conviction is not necessary. Id. (citing State v. Andrew B. Edwards, No. W1999-01095-CCA-R3-CD, 2000 WL 705309, at *3 (Tenn. Crim. App. May 26, 2000)).

Additionally, this court has previously held that a trial court may premise a revocation upon proven allegations of a violation warrant, even if the charges have been dismissed. State v. Delp, 614 S.W.2d 395, 396-97 (Tenn. Crim. App. 1980) (concluding that revocation may be based upon criminal acts alleged in the violation warrant even though the defendant was acquitted of charges for the underlying acts); State v. Agee Gabriel, No. M2002-01605-CCA-R3-CD, 2004 WL 1562551, at *3 (Tenn. Crim. App. July 12, 2004) (holding that "validity of the original warrant was not affected by the dismissal of the criminal charges arising from the acts alleged in the warrant"); State v. Larry D. Turnley, No. 01C01-9403-CR-00094, 1994 WL 714227, at *3 (Tenn. Crim. App. Dec. 22, 1994) ("The fact that the [d]efendant was not convicted of any of the offenses with which he was charged does not mandate dismissal of the probation violation warrant."). However, the State "must present sufficient facts at the revocation hearing to enable the trial court to 'make a conscientious and intelligent judgment as to whether the conduct in question violated the law.'" State v. Jason L. Holley, No. M2003-01429-CCA-R3-CD, 2005 WL 2874659, at *4 (Tenn. Crim. App. Oct. 25, 2005) (quoting Harkins, 811 S.W.2d at 83 n.3). Based upon these authorities, we reject the Defendant's argument.

Here, it was alleged in the warrant that the Defendant failed to obey the law based upon his arrest for possession of marijuana with the intent to sell and tampering with

evidence. The State was required to prove that the Defendant violated the law by a preponderance of the evidence based upon the criminal acts alleged in the warrant, not present evidence establishing all elements of the charged offenses beyond a reasonable doubt. Both Officers McDowell and Wright testified that on August 16, 2017, they were passing the Defendant's residence that he shared with his girlfriend, Ms. Crittenden, when they observed Mr. Lowe emerge from the residence with something in his hand and engage in a hand-to-hand transaction with an individual across the street. After approaching Mr. Lowe, the officers observed Mr. Lowe in possession of a plastic bag containing what appeared to be marijuana. Officer McDowell then knocked on the Defendant's front door. Following a slight delay, the door was opened, and both officers smelled the strong odor of marijuana. The Defendant admitted that "they" had recently smoked a blunt inside the home. Following a subsequent search, the officers found digital scales with a green, leafy residue, marijuana inside the toilet, marijuana still floating in the toilet, and $1,500 cash on the Defendant's person. The fact that Ms. Crittenden later claimed possession of the marijuana and admitted to flushing the marijuana down the toilet was not dispositive of the issue, and the trial court was free to reject that evidence as unbelievable. The trial court had sufficient evidence to conclude by a preponderance of the evidence that the Defendant violated the law by possessing marijuana on this occasion.

The Defendant also submits that the State failed to prove by a preponderance of the evidence that he violated his probation by participating in gang-related activity. The Defendant maintains "that the trial court abused its discretion in relying upon any of the photos because there was not adequate proof of when the photos were taken." Exhibits 6 and 8 were only admitted for identification purposes because it was not established when those photos were taken. Exhibit 11 was admitted for the limited purpose of establishing the Defendant's awareness of gang activity.

In its ruling, the trial court referenced each of the photographs presented to Officer McDowell at the revocation hearing. First, the trial court noted Exhibit 4, which was a photo of Kansas City Royals baseball cap found in the Defendant's home during the search. This evidence was unrelated to any Facebook posts and was found next to the digital scales with a green, leafy residue. Exhibit 7 reflected that two Facebook users wished the Defendant "Happy Crip Day" or "happy C day" on November 30, 2017. Officer McDowell, who was qualified as an expert on street crime and gang activity, testified that this was how members of the gang wished each other happy birthday. Moreover, the Defendant liked one of the posts. Exhibit 9 was a photo posted on January 3, 2018, wherein the Defendant was pictured with someone wearing a Kansas City Royals jersey and both men were making gang signs with their hands. As for Exhibit 10, the Defendant posted on Facebook on February 14 a picture of himself wearing a blue Washington Bullets shirt with the word "Kcoolin" above the photo. According to Officer

McDowell, the color blue and "Kcoolin" signified membership in the Kitchen Crips gang.

Importantly, we note that "[t]he strict rules of evidence do not apply in a probation revocation hearing." State v. Justin E. Stinnett, No. E2012-02289-CCA-R3-CD, 2013 WL 3148724, at *3 (Tenn. Crim. App. June 19, 2013) (citing Barker v. State, 483 S.W.2d 586, 589 (Tenn. Crim. App. 1972)). Furthermore, the Defendant began his probation on May 30, 2017, and was in control of the posts on his Facebook page after this time regardless of when the photos were taken. The dates of the posts in Exhibits 7, 9, and 10 were established. In these three exhibits, Kansas City Royals paraphernalia, gang signs, gang references, and the color blue can be seen. The other photographs were used to show the Defendant's awareness of gang activity and participation in the Kitchen Crips gang. Officer McDowell opined that the Defendant was an active member of the Kitchen Crips. Officer McDowell further stated that if the Defendant was not a member of the gang himself, he would have faced retaliation for using their insignia. From all of this evidence, there was sufficient evidence for the trial court to conclude by the preponderance of the evidence that the Defendant was involved in gang-related activity during his probation.

The Defendant does not dispute that he committed the "technical" violations listed in the second violation report but submits that these violations alone did not warrant the trial court's decision to incarcerate. The trial court found that the failure to report was a "very important violation." The trial court also determined that it would be "a little difficult . . . not to violate [the Defendant]" for failing to pay his fines, costs, or supervision fees given the amount of cash found on him, which made the violation appear to be a willful. Moreover, we have found that the trial court did not abuse its discretion in determining that the Defendant was involved in drug and gang-related activity.

The Defendant concludes that "the trial court abused its discretion in fully revoking" his probation "when sanctions or a partial revocation was warranted." The Defendant was originally indicted for attempted first degree murder and pled guilty to solicitation of aggravated assault. He had a prior conviction for facilitation of second degree murder. This court has repeatedly held that "an accused, already on [a suspended sentence], is not entitled to a second grant of probation or another form of alternative sentencing." State v. Dannie Brumfield, No. M2015-01940-CCA-R3-CD, 2016 WL 4251178, at *3 (Tenn. Crim. App. Aug. 10, 2016) (quoting State v. Jeffrey A. Warfield, No. 01C01-9711-CC-00504, 1999 WL 61065, at *2 (Tenn. Crim. App. Feb. 10, 1999)); see also State v. Timothy A. Johnson, No. M2001-01362-CCA-R3-CD, 2002 WL 242351, at *2 (Tenn. Crim. App. Feb. 11, 2002). Because there was sufficient evidence that the Defendant violated the terms of his release, the trial court, pursuant to its

-11-

discretionary authority, properly revoked the Defendant's probationary sentence and ordered him to serve the balance of her four-year sentence in confinement.

## CONCLUSION

Upon consideration of the foregoing and the record as a whole, we affirm the judgment of the trial court.

                    _____

                    D. KELLY THOMAS, JR., JUDGE